**FILED & ENTERED**

**SEP 24 2014**

**CLERK U.S. BANKRUPTCY COURT**
**Central District of California**
**BY zick          DEPUTY CLERK**

# NOT FOR PUBLICATION

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**NORTHERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Case. No. 9:12-bk-12561-PC |
| | ) | |
| MICHAEL EUGENE PEGLER, JR. and | ) | Adversary No. 9:12-ap-01286-PC |
| WENDY KATHLEEN PEGLER, | ) | |
| | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | **MEMORANDUM DECISION** |
| | ) | **REGARDING PLAINTIFF,** |
| | ) | **PACIFIC WESTERN BANK'S** |
| FIRST CALIFORNIA BANK, | ) | **MOTION FOR SUMMARY** |
| | ) | **JUDGMENT OR IN THE** |
| | ) | **ALTERNATIVE FOR SUMMARY** |
| Plaintiff, | ) | **ADJUDICATION OF CLAIMS AND** |
| | ) | **DEFENDANTS' MOTION FOR** |
| v. | ) | **SUMMARY JUDGMENT** |
| | ) | |
| | ) | Date:   August 7, 2014 |
| MICHAEL EUGENE PEGLER, JR. and | ) | Time:   9:30 a.m. |
| WENDY KATHLEEN PEGLER, | ) | Place:  United States Bankruptcy Court |
| | ) | Courtroom # 201 |
| Defendants. | ) | 1415 State Street |
| | ) | Santa Barbara, CA  93101 |

At the above captioned date and time, the court considered the Motion for Summary
Judgment or in the Alternative for Summary Adjudication of Claims filed by Plaintiff, Pacific
Western Bank, as successor by merger to First California Bank ("Pacific Western") and the
Motion for Summary Judgment filed by Defendants, Michael Eugene Pegler, Jr. and Wendy

Kathleen Pegler (either individually, "Michael Pegler" or "Wendy Pegler" or collectively, "the Peglers"). Appearances were stated on the record. Having considered the motions, the respective responses in opposition thereto, the summary judgment evidence,[1] and argument of counsel, the court will deny Pacific Western's motion and grant the Peglers' motion based on the findings set forth herein made pursuant to F.R.Civ.P. 56,[2] as incorporated into FRBP 7056 and applied to contested matters by FRBP 9014(c).

## I.  STATEMENT OF FACTS

The following facts are either established by the summary judgment evidence or are not genuinely in dispute:

1. HFONC, INC. ("HFONC"), a California corporation, operated a home furnishing or furniture consignment business from approximately June 1998 to April 17, 2012.

2. At all relevant times, Michael Pegler and Wendy Pegler were husband and wife.

3. The Peglers were the sole shareholders of HFONC and had been since 1998.

4. The Peglers were the only directors of HFONC and had been since 1998. However, Wendy Pegler did not serve on HFONC's board of directors from 2000 to the end of 2007.

---

[1] With respect to Plaintiff's Objections to Defendants' Evidence Re: Defendants' Motion for Summary Judgment, the court sustains objection # 1 and overrules objections # 2 through # 7. With respect to Plaintiff's Objections to Defendants' Evidence Re: Defendants' Response to Plaintiff's Motion for Summary Judgment/Summary Adjudication, the court overrules objections # 1 through # 5. With respect to Defendants' Evidentiary Objections to the Declarations of Steve Buckles and Cindy Giammarrusco, the court (a) sustains objection # 4 and overrules objections # 1 through # 3 to the Declaration of Steve Buckles; and (b) sustains objection # 5 and overrules objections # 6 through # 8 to the Declaration of Cindy Giammarrusco. See F.R.Civ.P. 56(c)(2).

[2] Unless otherwise indicated, all "Code," "chapter" and "section" references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1330 after its amendment by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. 109-8, 119 Stat. 23 (2005). "Rule" references are to the Federal Rules of Bankruptcy Procedure ("FRBP"), which make applicable certain Federal Rules of Civil Procedure ("F.R.Civ.P."). "LBR" references are to the Local Bankruptcy Rules of the United States Bankruptcy Court for the Central District of California ("LBR").

5. Michael Pegler at all relevant times was the President and Secretary of HFONC, as well as its Chief Executive Officer.

6. Wendy Pegler at all relevant times was the Chief Financial Officer of HFONC, but she did not serve as Chief Financial Officer from 2000 to the end of 2007.

7. From 2000 to the end of 2007, Wendy Pegler remained involved in the business operations of HFONC to the extent that she reviewed HFONC's budget for payroll and scheduled work for employees.

The HFONC Loan

8. On or about May 23, 2008, HFONC executed a Promissory Note in the original principal sum of $150,000, bearing interest at the rate of 7% per annum and payable to Western Commercial Bank ("WCB") dated May 23, 2008 (the "HFONC Loan").

9. To secure payment of the HFONC Loan, HFONC executed a Commercial Security Agreement dated May 23, 2008, granting WCB a security interest in HFONC's inventory, equipment, accounts and other collateral more particularly described therein.

10. Michael Pegler signed the Promissory Note and Commercial Security Agreement as President/Secretary of HFONC.  Wendy Pegler did not sign either document.

11. The Promissory Note required monthly payments from HFONC of accrued interest only, beginning on June 28, 2008, and continuing regularly and monthly thereafter until maturity on May 23, 2009.

12. Michael Pegler executed a Commercial Guaranty under the terms of which he personally guaranteed payment of the HFONC Loan.

13. Wendy Pegler executed a Commercial Guaranty under the terms of which she personally guaranteed payment of the HFONC Loan.

14. Each Commercial Guaranty signed by the Peglers provided that the agreement to personally guaranty payment of the HFONC Loan would survive and continue until the loan was paid in full.

15. There is no allegation that either Michael Pegler or Wendy Pegler made any false representations or fraudulent omissions, either individually or as an officer of HFONC, in connection with the original HFONC Loan.

The First HFONC Loan Extension

16. HFONC executed a Change in Terms Agreement in favor of WCB dated May 23, 2009, which, in pertinent part: (a) extended the maturity date of the HFONC Loan from May 23, 2009 to May 23, 2010; (b) changed the interest rate floor from 7% to 6% effective upon document execution; and (c) changed the effective rate of interest on the HFONC Loan from 7% to 6% effective upon document execution.  The Change in Terms Agreement required monthly payments from HFONC of accrued interest only, beginning on August 23, 2009, and continuing regularly and monthly thereafter until maturity on May 23, 2010.

17. The Change in Terms Agreement was signed by Michael Pegler, as President/Secretary of HFONC.

18. In conjunction with the Change in Terms Agreement, HFONC executed a Business Loan Agreement in favor of WCB dated May 23, 2009.  The Business Loan Agreement was signed by Michael Pegler, as President/Secretary of HFONC.

19. Michael Pegler and Wendy Pegler signed Exhibit "A" to the Business Loan Agreement dated May 23, 2009, as Guarantors, acknowledging that they had "read all the provisions of the Loan Agreement" and "agree[d] to its terms and conditions."

20. HFONC was current in the payment of accrued interest on the HFONC Loan at the time of the first loan extension.

21. There is no allegation that either Michael Pegler or Wendy Pegler made any false representations or fraudulent omissions, either individually or as an officer of HFONC, in connection with the First HFONC Loan Extension.

The Second HFONC Loan Extension

22. In April 2010, Michael Pegler contacted WCB regarding a second extension of the HFONC Loan.

23. On April 27, 2010, WCB requested financial information from HFONC and the Peglers in conjunction with the second HFONC Loan extension request.

24. In response to WCB's request, Michael Pegler, on behalf of HFONC and on his own behalf as a guarantor of the HFONC Loan, submitted tax returns and the following financial information to WCB: (a) HFONC's Balance Sheet, as of June 30, 2010; (b) HFONC's Profit and Loss Statement for the period of July 2009 through June 2010; and (c) a Personal Financial Statement, as of May 31, 2010.

25. Michael Pegler signed a Business Financial Certification as President/Secretary of HFONC certifying the truthfulness of the information contained in HFONC's financial statements dated June 30, 2009 and June 30, 2010, and HFONC's tax returns for 2008 and 2009.

26. Michael Pegler and Wendy Pegler signed a Personal Financial Certification certifying the truthfulness of the information contained in their Personal Financial Statement dated May 31, 2010 and their personal income tax return for 2009.

HFONC's Past Due Rent

27. HFONC leased from Via Colinas Property LLC ("VCP") certain commercial space at 31293 Via Colinas, Westlake Village, CA pursuant to a Commercial Lease dated May 5, 2003, as amended by First Amendment to Lease dated April 30, 2008 ("VCP Lease").

28. Michael Pegler was a guarantor of the VCP Lease.

29. On April 5, 2010, VCP advised HFONC that it owed accumulated rent under the VCP Lease of $49,271.29 through December 31, 2009, plus an additional $27,648.94 for the months of January and February 2010, for a total of $76,920.23 in unpaid rent and accrued Common Area Maintenance ("CAM") charges.

30. By June 30, 2010, HFONC owed VCP a total of $119,780.01 in unpaid rent and accrued CAM charges under the VCP Lease.

31. HFONC did not disclose the past due rent and accrued CAM charges owing to VCP on the VCP Lease in its Balance Sheet as of June 30, 2010, or its Profit and Loss Statement for the period of July 2009 through June 2010.

32. The Peglers did not disclose the past due rent and accrued CAM charges owing to VCP on the VCP Lease as a contingent liability of Michael Pegler in their Personal Financial Statement as of May 31, 2010.

33. By letter dated August 20, 2010, HFONC and VCP modified the terms of rent payable under the VCP Lease.  The letter agreement provided for a reduction in monthly rent for 2010, but confirmed that HFONC remained liable for delinquent rent, attorneys' fees, and other amounts attributable to the VCP Lease totaling in excess of $66,000.  The letter agreement stated, in pertinent part:

> a. Tenant confirms that as of this date, only seven months rent have been paid for 2010, therefore, Tenant will pay an additional twelve thousand dollars as follows:  five hundred dollars ($500) per month August 2010 through July 2012.
> b. The past due water bill in the amount of $1,532.46 will be paid in two equal parts . . .
> c. Tenant shall pay to Landlord the sum of (i) unpaid rent and CAM fees accumulated prior to January 1, 2010 in the amount of $49,271.29, plus (ii) attorney fees related to this matter in the amount of $4,000.00, for a total of $53,271.29, which amount shall be amortized over the remaining thirty six months of the lease with payments commencing on January 1, 2011 in the amount of $1,479.76 per month.[3]

34. HFONC did not disclose to WCB at any time prior to WCB's approval of the Second HFONC Loan Extension that HFONC remained liable for over $66,000 in delinquent rent, attorneys' fees, and other amounts attributable to the VCP Lease after execution of the August 20, 2010 letter agreement.

35. The Peglers did not disclose to WCB at any time prior to WCB's approval of the Second HFONC Loan Extension that Michael Pegler had a contingent liability for over $66,000 in delinquent rent, attorneys' fees, and other amounts attributable to the VCP Lease after execution of the August 20, 2010 letter agreement.

---

[3] Plaintiff's, Pacific Western Bank's, Appendix of Exhibits in Support of Motion for Summary Judgment or in the Alternative for Summary Adjudication of Claims ("Pacific Western's Appendix"), Exh. # 16, at 105.

Valuation of Personal Property

36. In their Personal Financial Statement as of May 31, 2010, the Peglers valued their personal property, exclusive of cash, retirement accounts, automobiles, and stocks and bonds, at $60,000.

37. In their Personal Financial Statement as of May 31, 2010, the Peglers valued their stock in HFONC at $500,000.

38. In Schedule B [Dkt. # 12] filed on July 18, 2012, the Peglers disclosed under penalty of perjury personal property, exclusive of cash, retirement accounts, automobiles, and stocks and bonds, having a value of $13,700.

39.  In Schedule B [Dkt. # 12] filed on July 18, 2012, the Peglers disclosed under penalty of perjury the HFONC stock valued at $0.

40.  The Peglers admit that they did not gift, transfer, sell, destroy, or otherwise dispose of any personal property or home furnishings during the two years prior to May 1, 2012.

41. The Peglers disclosed under penalty of perjury in response to Question 8 of their Statement of Financial Affairs that they did not lose any property due to fire, theft or other casualty within 1 year of the petition date on July 4, 2012; and disclosed under penalty of perjury in response to Question 10(a) of their Statement of Financial Affairs that they did not transfer any property, other than property transferred in the ordinary course of the business or financial affairs of the debtors, within 2 years of the petition date.

Oxnard Store

42. In May or on or about June 10, 2010, Michael Pegler advised WCB's Assistant Vice President and Credit Analyst, Steve Buckles ("Buckles"):  (a) that in late May he had executed a lease with Reed's Furniture for the second HFONC location in Oxnard to be located on a strip that runs parallel to the 101 Freeway; (b) that such location would benefit from the heavy advertising by Reed's Furniture and Discount Warehouse, as well as other small furniture warehouses; and (c) that those existing stores have visible advertising which attracts high volumes of traffic throughout the year.

43. At that time, Michael Pegler explained to Buckles:  (a)  that he had already signed the lease because it was too good of an opportunity to pass up; and (b) that the additional HFONC location would help increase revenue for the company with little expenses needed to pay for advertising which is a primary expense for his type of business.

44. Michael Pegler had discussions with Buckles in early or mid-2010 regarding his decision to open a new consignment location in Oxnard and he provided projections to WCB concerning the opening of the prospective Oxnard store.

45. In 2010, Michael Pegler, with the assistance of a company, Pathfinder Metrics, created a 16-page document, the first page of which is captioned "Home Furnishings on Consignment – Oxnard Financial Plan Summary" ("Oxnard Location Financial Plan").

46. The Oxnard Location Financial Plan contains projected detailed information concerning income and expenses, but it does not contain any information regarding actual income or expenses and was prepared sometime prior to the opening of the Oxnard store on August 1, 2010.

47. Michael Pegler provided the Oxnard Location Financial Plan to WCB "to show that things were going in the right direction, [and] to justify continued interest only payments until Oxnard was established and able to . . . be successful."[4]

48. On July 29, 2010, Michael Pegler incorporated TCW Furnishings LLC.  Michael Pegler is the Manager and agent for service of TCW Furnishings LLC.

49. The Oxnard consignment store was located at 921 E. Ventura Blvd., Oxnard, CA and owned by TCW Furnishings LLC.

50. In his email to Buckles dated August 31, 2010, Michael Pegler did not disclose his intention to incorporate the Oxnard business location as "TCW-Oxnard."

51. Michael Pegler did not disclose to WCB that he had formed TCW Furnishings LLC and had for some time, at least from August 1, 2010 to September 22, 2010, operated the

---

[4]  Joint PreTrial Stipulation and Order, 15:21-23.

Oxnard consignment business as a limited liability company separate and apart from HFONC.

52. On September 22, 2010, "TCW-Oxnard" filed articles of incorporation designating Michael Pegler as its incorporator and agent for service.

53. The Peglers represented to WCB that their Oxnard consignment store was a second location for HFONC's consignment business that would financially benefit HFONC.

54. At all times in 2010, Michael Pegler intended the Oxnard consignment store to be operated as a separate business entity from HFONC.

55. On or about September 3, 2010, WCB approved the Second HFONC Loan Extension.

56. On or about September 16, 2010, HFONC executed a Change in Terms Agreement in favor of WCB dated May 23, 2010, which, in pertinent part, (a) extended the maturity date of the HFONC Loan from May 23, 2010 to December 1, 2010; (b) reduced the principal amount of the HFONC Loan from $150,000 to $145,000; (c) changed the interest rate floor from 6% to 7% effective upon document execution; (d) increased the effective rate of interest from 6% to 7% effective upon document execution; and (d) removed the revolving credit feature from the loan. The Change in Terms Agreement required monthly payments from HFONC of accrued interest only, beginning on October 1, 2010, and continuing regularly and monthly thereafter until maturity on December 1, 2010.

57. The Change in Terms Agreement was signed by Michael Pegler, as President/Secretary of HFONC.

58. In conjunction with the Change in Terms Agreement, HFONC executed a Business Loan Agreement in favor of WCB dated May 23, 2010.  The Business Loan Agreement was signed by Michael Pegler, as President/Secretary of HFONC.

59. Michael Pegler and Wendy Pegler signed Exhibit "A" to the Business Loan Agreement dated May 23, 2010, as Guarantors, acknowledging that they had "read all the provisions of the Loan Agreement" and "agree[d] to its terms and conditions."

60. HFONC was current in the payment of accrued interest on the HFONC Loan at the time of the Second HFONC Loan Extension.

HFONC Loan Matures

61. On or about November 5, 2010, WCB was closed by the California Department of Financial Institutions and the Federal Deposit Insurance Corporation ("FDIC") was named as Receiver.  First California Bank ("FCB") acquired the assets of WCB from the FDIC, including the HFONC Loan.

62. The HFONC Loan matured on December 1, 2010.  HFONC did not pay the principal and accrued interest due on the HFONC Loan at maturity.

63. The Peglers did not pay the principal and accrued interest due on the HFONC Loan pursuant to their respective Commercial Guaranty agreements.

64. On May 5, 2011, FCB filed a complaint against HFONC and the Peglers in Case No. 56-2011-00396551-CU-CL-VTA, First California Bank v. HFONC, INC., et al., in the Superior Court of California, County of Ventura, to recover the balance due on the HFONC Loan.

65. On or about April 17, 2012, HFONC ceased doing business.

66. On April 18, 2012, a Judgment By Court After Default was entered in the state court action in favor of FCB and against HFONC in the principal amount of $144,797.07, interest in the amount of $16,231.06, late charges in the amount of $7,239.85, attorneys' fees in the amount of $7,585.45 and costs in the amount of $820.00, for a total judgment of $176,673.43.

Peglers' First Bankruptcy Case

67. On April 17, 2012, the Peglers filed a voluntary chapter 13 petition in Case No. 9:12-bk-11547-RR, In re Michael E. Pegler, Jr., et ux., Debtors, in the United States Bankruptcy Court, Central District of California, Northern Division.

68. The case was dismissed on June 27, 2012.

Peglers' Second Bankruptcy Case

69. On July 4, 2012, the Peglers filed a voluntary chapter 13 petition in Case No. 9:12-bk-12561-RR, In re Michael E. Pegler, Jr., et. ux., Debtors, in the United States Bankruptcy Court, Central District of California, Northern Division.

70. In their schedules filed on July 18, 2012, FCB is listed in Schedule F as the holder of an unsecured non-priority claim in the amount of $176,673.00 attributable to the Peglers' personal guaranty of the HFONC Loan.

71. On October 29, 2012, the court converted the Peglers' chapter 13 case to a case under chapter 11 of the Bankruptcy Code.  The case remains pending in chapter 11.

The Adversary Proceeding

72. On October 15, 2012, FCB filed a complaint in Adversary No. 9:12-ap-01286-RR, First California Bank v. Michael Eugene Pegler, Jr., et ux., seeking (a) a judgment against the Peglers in the principal sum of $176,673.43, plus interest thereon from April 18, 2012 at the rate of 10% per annum to the date of entry of judgment, reasonable attorneys' fees and costs of court; and (b) for a determination that the judgment is non-dischargeable under 11 U.S.C. § 523(a)(2)(A) and/or 11 U.S.C. § 523(a)(2)(B).

73. On November 15, 2012, the Peglers filed an answer to FCB's complaint.

74. On or about May 31, 2013, FCB merged with and into Pacific Western. Pacific Western is the successor in interest to FCB's rights under the HFONC Loan documents and Commercial Guaranty agreements and has standing to pursue the claims made the basis of this adversary proceeding.

75. On June 23, 2014, the Peglers filed their Motion for Summary Judgment.

76. On June 26, 2014, Pacific Western filed its Motion for Summary Judgment or in the Alternative Summary Adjudication of Claims.

77. On July 15, 2014, the Peglers filed their response in opposition to Pacific Western's motion for summary judgment.  Pacific Western filed an opposition to the Peglers's summary judgment motion on July 16, 2014.

78. On July 22, 2014, the Peglers filed a reply to Pacific Western's opposition.  Pacific Western filed a reply to the Peglers' opposition on July 24, 2014.

79. Pacific Western's claims are based solely on false representations and/or fraudulent omissions allegedly made by Michael Pegler and/or Wendy Pegler on or after April 1, 2010, in connection with the Second HFONC Loan Extension.

80. Pacific Western claims that its damages "are those amounts due and unpaid on the loan."[5] Specifically, Pacific Western claims that its "damages are as follows:  Amount of Judgment entered on April 18, 2012 in the amount of $176,673.43, plus interest thereon from April 18, 2012 at the rate of 10% per annum ($48.40 per day)," plus attorneys' fees and costs of court.[6]

81. At a hearing on August 7, 2014, the court took each of the motions for summary judgment under submission.

## II.  CONCLUSIONS OF LAW

This court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(b) and 1334(b).  This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (I) and (O).  Venue is appropriate in this court.  28 U.S.C. § 1409(a).  Pacific Western and the Peglers have consented to the entry of a final judgment by this court.  Objections to the dischargeability of a debt are literally and strictly construed against the objector and liberally construed in favor of the debtor.  See  Quarre v. Saylor (In re Saylor), 108 F.3d 219, 221 (9th Cir. 1997).

A.  Standard for Summary Judgment.

1.  Rule 56(a) authorizes a party to "move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought."  F.R.Civ.P. 56(a).  Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Id.  An issue is "genuine" only if there is an evidentiary basis on which a reasonable fact

---

[5]  Id. at 19:18.

[6]  Id. at 19:27 – 20:2.

finder could find for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A disputed fact is "material" only if it could affect the outcome of the suit under governing law.  Id.  Moreover, where different ultimate inferences may be drawn, summary judgment is inappropriate.  Sankovich v. Insurance Co. of N. Am., 638 F.2d 136, 140 (9th Cir.1981).

2.  In determining whether a genuine factual issue exists, "a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability . . . ."  Anderson, 477 U.S. at 254.  "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial . . . .  If the evidence is merely colorable, or is not significantly probative, . . . summary judgment may be granted.  Id. at 249–250.  However, the court's function on a motion for summary judgment is "issue-finding, not issue-resolution."  United States v. One Tintoretto Painting Entitled "The Holy Catholic Family With Saint Catherine and Honored Donor," 691 F.2d 603, 606 (2d Cir. 1982).

3.  Rule 56 does not permit "trial on affidavits.  Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are [fact finder] functions . . . ."  Anderson, 477 U.S. at 255.

4.  Rule 56(c), which identifies the procedures the court and parties must follow in conjunction with motions for summary judgment, states:

> (1) **Supporting Factual Positions**. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> > (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> >
> > (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> (2) **Objection That a Fact Is Not Supported by Admissible Evidence**. A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

(3) **Materials Not Cited**. The court need consider only the cited materials, but it may consider other materials in the record.

(4) **Affidavits or Declarations**. An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

F.R.Civ.P. 56(c). The court may grant summary judgment "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c)." See F.R.Civ.P. 56(e)(3).

5. The moving party has the burden of establishing the absence of a genuine issue of material fact. Celotex v. Catrett, 477 U.S. 317, 323 (1986). "Once the moving party carries its initial burden, the adverse party 'may not rest upon the mere allegations or denials of the adverse party's pleading,' but must provide affidavits or other sources of evidence that 'set forth specific facts showing that there is a genuine issue for trial.' " Devereaux v. Abbey, 263 F.3d 1070, 1076 (9th Cir. 2001) (quoting former F.R.Civ.P. 56(e)); see Celotex, 477 U.S. at 323-24.

6. When the nonmoving party has the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325; see Fairbank v. Wunderman Cato Johnson, 212 F.3d 528, 532 (9th Cir. 2000) (stating that the Celotex showing can be made by "pointing out through argument-the absence of evidence to support plaintiff's claim"). If the nonmoving party fails to establish a triable issue "on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to judgment as a matter of law. Celotex, 477 U.S. at 323.

B. Pacific Western's First Claim for Relief – Nondischargeability of Debt Under 11 U.S.C. § 523(a)(2)(A).

1. Section 523(a)(2)(A) excepts from discharge "any debt. . . for money, property, services, or an extension, renewal, or refinance of credit, to the extent obtained by. . . false pretenses, a false representation, or actual fraud." 11 U.S.C. § 523(a)(2)(A).

2. To establish that a debt is nondischargeable under § 523(a)(2)(A), the creditor must show by a preponderance of the evidence that (a) debtor made a representation; (b) at the time,

debtor knew the representation was false; (c) debtor made the representation with the intention and purpose of deceiving the creditor; (d) the creditor justifiably relied on the debtor's representation, and (e) the creditor sustained the alleged loss and damage as the proximate result of such representation.  <u>Diamond v. Kolcum (In re Diamond)</u>, 285 F.3d 822, 827 (9th Cir. 2002); <u>Turtle Rock Meadows Homeowners Ass'n v. Slyman (In re Slyman)</u>, 234 F.3d 1081, 1085 (9th Cir. 2000).

3.  Knowledge and intent may be proven through circumstantial evidence.  <u>Cowen v. Kennedy (In re Kennedy)</u>, 108 F.3d 1015, 1018 (9th Cir.1997).

4.  The concealment or omission of material facts that a party has a duty to disclose can support the nondischargeability of a debt on the grounds of actual fraud.  <u>Apte v. Japra (In re Apte)</u>, 96 F.3d 1319, 1323-24 (9th Cir. 1996).

5.  A debtor's failure to disclose material facts constitutes a fraudulent omission under § 523(a)(2)(A) if the debtor was under a duty to disclose and the debtor's omission was motivated by an intent to deceive. <u>Citibank (South Dakota), N.A. v. Eashai (In re Eashai)</u>, 87 F.3d 1082, 1089–90 (9th Cir.1996).  A "concealed fact" is material if "a reasonable man would attach importance to the alleged omissions in determining his course of action".  <u>Mandalay Resort Group v. Miller (In re Miller)</u>, 310 B.R. 185, 196 (Bankr. C.D. Cal. 2004).

6. Under California law, a concealment is fraudulent if:  (1) the defendant concealed or suppressed a material fact; (2) the defendant had a duty to disclose the fact to the plaintiff at the time of the concealment; (3) the defendant intentionally concealed the fact with the intent to defraud plaintiff; (4) the plaintiff was unaware of the fact and would not have acted as he did if he had known the fact; and (5) the plaintiff sustained damages as a result of the concealment. <u>See  Blickman Turkus, LP v. MF Downtown Sunnyvale, LLC</u>, 162 Cal.App.4th 858, 868 (2008).

7.  The nondisclosure of a material fact in the face of a duty to disclose establishes the requisite reliance and causation for actual fraud under the Bankruptcy Code.  <u>Apte</u>, 96 F.3d at 1323.

8.  Further, nothing in § 523(a)(2) requires that "an extension of credit be joined by an advance of further funds in order for a creditor to have a claim for relief." <u>Cho Hung Bank v. Kim (In re Kim)</u>, 163 B.R. 157, 159 (9th Cir. BAP 1994) <u>aff'd</u>, 62 F.3d 1511 (9th Cir. 1995).

9.  Finally, a representation, for purposes of § 523(a)(2)(A) must be <u>other</u> than a statement respecting the debtor's financial condition. 11 U.S.C. § 523(a)(2)(A).  Because the phrase "statement respecting the debtor's ... financial condition" is interpreted narrowly, only statements that "purport to present a picture of the debtor's overall financial health" are excluded from § 523(a)(2)(A).  <u>Barnes v. Belice (In re Belice)</u>, 461 B.R. 564, 577-78 (9th Cir. BAP 2011).[7]

     1.  <u>Michael Pegler, as President/Secretary of HFONC, Knowingly Made False Representations to WCB and Knowingly Concealed Material Information From WCB in Connection With the Second HFONC Loan Extension</u>

In California, "[d]irectors and officers of a corporation do not incur personal liability for the torts of the corporation unless they participate in the wrong or authorize or direct that it be done." <u>Schwartz v. Pillsbury Inc.</u>, 969 F.2d 840, 843 (9th Cir. 1992) (citing <u>United States Liab. Ins. Co. v. Haidinger–Hayes, Inc.</u>, 1 Cal.3d 586, 595 (1970)); <u>see</u> <u>Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.</u>, 173 F.3d 725, 734 (9th Cir.1999) (stating that a corporate officer cannot "hide behind the corporation where he is an actual participant in the tort").  "Personal liability, if otherwise justified, may rest upon a 'conspiracy' among the officers and directors to injure third parties through the corporation." <u>Schwartz</u>, 969 F.2d at 843 (citing <u>Wyatt v. Union Mort. Co.</u>, 24 Cal.3d 773, 785 (1979)).  "This principle applies regardless of the piercing of the corporate veil." <u>Woodworking Enters., Inc. v. Baird (In re Baird)</u>, 114 B.R. 198, 204 (9th Cir. BAP 1990). The issue is whether the corporate officer "authorize[d], direct[ed], or in some meaningful sense actively participat[ed] in the wrongful conduct." <u>Lord Abbett Mun. Income Fund, Inc. v. Asami</u>,

---

[7]  Statements regarding the financial condition of the debtor include: "balance sheets, income statements, statements of changes in overall financial position, or income and debt statements that present the debtor or insider's net worth, overall financial health, or equation of assets and liabilities." <u>Belice</u>, 461 B.R. at 578.

2014 WL 3417941, *7 (N.D. Cal. July 11, 2014) (citing Frances T. v. Village Green Owners
Ass'n, 42 Cal.3d 490, 503-04 (1986)).

There is no evidence that Wendy Pegler, as an officer of HFONC, made a false
representation to WCB or concealed material information from WCB in connection with the
Second HFONC Loan Extension.  Nor is there evidence that she authorized, directed, or
otherwise meaningfully participated in any representations and omissions made to WCB by
Michael Pegler, as President/Secretary of HFONC, in connection with the Second HFONC Loan
Extension.  According to the evidence, the only representations made by Wendy Pegler were
contained in the Personal Financial Statement which form the basis of Pacific Western's claim
under § 523(a)(2)(B).

According to the summary judgment evidence, the HFONC Loan, as extended by the
First HFONC Loan Extension, was scheduled to mature on May 23, 2010.  In April 2010,
HFONC commenced negotiations with WCB regarding a further extension of the HFONC Loan.
The negotiations between HFONC and WCB regarding the loan extension continued through the
scheduled maturity date of the HFONC Loan until September 3, 2010, when WCB approved the
Second HFONC Loan Extension effective May 23, 2010.

In May or on or about June 10, 2010, Michael Pegler advised Buckles that in late May he
had executed a lease with Reed's Furniture for a second HFONC location at 921 E. Ventura
Blvd., Oxnard, CA.  He later provided WCB with the Oxnard Location Financial Plan, admitting
that his intention was "to show that things were going in the right direction, [and] to justify
continued interest only payments until Oxnard was established and able to . . . be successful."[8]

During the course of the negotiations regarding the Second HFONC Loan Extension with
WCB, Michael Pegler, individually and in his capacity as President/Secretary of HFONC,
represented to WCB and lead WCB to believe that the Oxnard consignment store was a second

---

[8] See footnote # 4, supra.

location for HFONC's consignment business that would benefit HFONC financially.  In doing

so, Michael Pegler also concealed the following facts from WCB:

1. That Michael Pegler incorporated TCW Furnishings, LLC as a limited liability company on July 29, 2010;

2. That Michael Pegler was the Manager and agent for service of TCW Furnishings, LLC;

3. That the consignment store located at 921 E. Ventura Blvd., Oxnard, CA was owned and operated by TCW Furnishings, LLC, not HFONC;

4. That TCW Furnishings, LLC operated the consignment store at 921 E. Ventura Blvd., Oxnard, CA from August 1, 2010 to approximately September 22, 2010, not HFONC;

5. That at all times in 2010, Michael Pegler intended that the consignment store located at 921 E. Ventura Blvd., Oxnard, CA was to be operated by or as an entity separate and apart from HFONC; and

6. That HFONC owed VCP delinquent rent, attorneys' fees, and other amounts attributable to the VCP Lease totaling in excess of $66,000.

In an email to Buckles dated August 13, 2010, in response to WCB's requests for financial

information, Michael Pegler stated:

> I just finalized a rent reduction with my landlord.  I was able to lower our monthly rent from approx. $16,000 + $2400 in CAM expenses to a flat $12,000 per month for the entire calendar year of 2010.  We will review this in December, and if there is no significant change in our economy, we will extend this arrangement.  My landlord would much rather get a reduced rent from me than have a vacant 20,000 sq. ft. building.  We've been negotiating on this for many months, and the rent paid has been fluctuating because we hadn't formalized the agreement.  But, now that it's finalized, it was a major coup to have the unpaid balance waived for the entire year, along with the rent reduction.[9]

After execution of the letter agreement dated August 20, 2010, Michael Pegler failed to disclose

to Buckles the fact that, in conjunction with the reduction in monthly rent for 2010, HFONC

confirmed its liability to VCP for delinquent rent, attorneys' fees, and other amounts attributable

to the VCP Lease totaling in excess of $66,000 and agreed to pay such amount over time in

accordance with the terms of the letter agreement.  In a later email to Buckles dated August 31,

2010, Michael Pegler stated:

---

[9]  Pacific Western's Appendix, Exh. # 9, at 56.

When we last spoke, I told you it would be a hardship for my company, and frankly me personally to term out the loan at this time. The Oxnard store is at a critical stage, having only been open for 30 days. Since the request for additional credit was denied, the pressure on cash flow is much greater. Additionally, to term out my line, increasing my overhead by increasing my payment by about $2462 may just "break the camel's back". I'm just afraid that I won't be able to stay current.

I'd like to propose that we continue the interest only payment for the next 4 months, and review my account again at the end of the year. I'm willing to provide on-going financials and full disclosure during this period. I'm confident that the Oxnard store will be on track, and reaching it's [sic] projected sales goals by then.

So far, we are ahead of projections. Projected sales for our first month of business (August 2010), were $25,000. As of today, our actual sales are $35,300. So, that's a great start, and I haven't started my marketing and PR campaign yet.

As you know, opening the second store was a calculated risk on my part. But, I saw it as a move that might save my company. It's looking like a good gamble, and in just a few months, I should be in a much stronger financial position. If terming out the loan makes sense at that point, then so be it, but my plans are to make principle [sic] reductions, and get the balance substantially reduced in the next 12 months.

Allowing the interest only payments to continue while Oxnard is in it's [sic] infancy will allow me to effectively market, advertise, and drive sales. There is ample market share available out there in the furniture business. The attrition rate of furniture stores has been very alarming. I plan to survive and prosper in the coming years, and I am on my way. . . .[10]

Michael Pegler's email is silent about HFONC's debt to VCP in excess of $66,000 for delinquent rent, attorneys' fees, and other amounts attributable to the VCP Lease. In neither email to Buckles did Michael Pegler disclose to WCB that he had formed TCW Furnishings, LLC and had for some time, at least from August 1, 2010, operated the Oxnard consignment store as a limited liability company separate and apart from HFONC. Nor did Michael Pegler disclose in either email to Buckles the intention to incorporate the consignment store located at 921 E. Ventura Blvd., Oxnard, CA, as TCW-Oxnard. At no time did Michael Pegler disclose to WCB during negotiations between WCB and HFONC regarding the Second HFONC Loan Extension

---

[10] Id., Exh. # 8, at 53.

that he never intended the new consignment store at 921 E. Ventura Blvd., Oxnard, CA to be owned and operated by HFONC.

  2. Knowledge and Intent

  "Where intent is at issue, summary judgment is seldom granted."  Gertsch v. Johnson & Johnson Fin. Corp. (In re Gertsch), 237 B.R. 160, 165 (9th Cir. BAP 1999); see Provenz v. Miller, 102 F.3d 1478, 1489 (9th Cir. 1996), cert. denied, 522 U.S. 808 (1997) ("Generally, scienter should not be resolved by summary judgment.").  "[H]owever, 'summary judgment is appropriate if all reasonable inferences defeat the claims of one side, even when intent is at issue.'"  Gertsch, 237 B.R. at 165 (quoting Newman v. Checkrite California, Inc., 912 F.Supp. 1354, 1380 (E.D. Cal. 1995) (citation omitted)).

  A debtor's knowledge may be shown by circumstantial evidence and inferred from the debtor's course of conduct.  Tallant v. Kaufman (In re Tallant), 218 B.R. 58, 66 (9th Cir. BAP 1998).  "[I]ntent to deceive can be inferred from the totality of circumstances, including reckless disregard for the truth."  Gertsch, 237 B.R. at 167-68.  "A representation may be fraudulent, without knowledge of its falsity, if the person making it 'is conscious that he has merely a belief in its existence and recognizes that there is a chance, more or less great, that the fact may not be as it is represented.'"  Id. at 168.

  Michael Pegler, as President/Secretary of HFONC, had a duty to disclose to WCB each of the above described facts that were concealed from WCB during the course of the negotiations between HFONC and WCB for the Second HFONC Loan Extension.  Each of the concealed facts was material in that WCB, in the exercise of ordinary care in making the Second HFONC Loan Extension, would have attached importance to the concealed information in making an informed decision whether to approve or deny HFONC's requested extension.  In fact, WCB would not have approved the Second HFONC Loan Extension had it known the facts concealed by Michael Pegler, as President/Secretary of HFONC.[11]

---

[11] Declaration of Steve Buckles ("Buckles Decl.") 11:15 – 13:1.

Michael Pegler admits that (a) between May 1, 2010 and June 10, 2010, he informed "WCB that <u>HFONC INC.</u> had leased a second store location in Oxnard;" (b) between early and mid-2010, he disclosed to WCB that he was going to open a second store, in Oxnard, and gave WCB the Oxnard Location Financial Plan; and (c) TCW Furnishings, LLC was formed on August 19, 2010, to thereafter own and operate the Oxnard store.[12]  However, Michael Pegler does not explain why, after having represented to WCB that the Oxnard location would owned by HFONC, he did not thereafter disclose to WCB during the course of HFONC's negotiations with WCB regarding the Second HFONC Loan Extension that the second store at 921 E. Ventura Blvd., Oxnard, CA would not be owned and operated by HFONC, but would, in fact, be owned and operated by a separate and independent entity.  Michael Pegler admits that he provided WCB with the Oxnard Location Financial Plan "to show that things were going in the right direction, to justify continued interest only payments until Oxnard was established and able to . . . be successful."[13]  Nor does Michael Pegler explain why he led WCB to believe that HFONC was current on its rent obligations when, in fact, HFONC owed over $66,000 in delinquent rent and accrued CAM charges on the VCP Lease during HFONC's negotiations with WCB for the Second HFONC Loan Extension.  The only reasonable inference that can be drawn is that Michael Pegler, as President/Secretary of HFONC, made each of the false representations to WCB and concealed material information from WCB with the intention and purpose of deceiving WCB into approving the Second HFONC Loan Extension. The Peglers have not articulated any factual basis or produced significantly probative evidence on this issue to support an inference to the contrary other than to claim that HFONC "had no intent not to pay the loan, and [the Peglers] had no intent not to pay any liability they might have in the future as guarantors."[14]  These conclusory statements are insufficient to create a genuine issue for trial.

---

[12]  Defendants' Motion for Summary Judgment ("Peglers' Motion") 12:4-24 (emphasis added).

[13]  <u>See</u> footnote # 4, <u>supra</u>.

[14]  Peglers' Motion, at 12:24-26.

3.   <u>Justifiable Reliance</u>

Section 523(a)(2)(A) requires justifiable reliance.  <u>Field v. Mans</u>, 516 U.S. at 74-75.

Justifiable reliance is a subjective standard.  <u>Id.</u> at 70.  "In determining that issue, the court must

look to all of the circumstances surrounding the particular transaction and must particularly

consider the subjective effect of those circumstances upon the creditor."  <u>Genel Co., Inc. v.</u>

<u>Bowen (In re Bowen)</u>, 198 B.R. 551, 556-57 (9th Cir. BAP 1996).  The plaintiff must have

actually relied on the false representation before the justifiable reliance requirement can be met.

<u>Field</u>, 516 U.S. at 70.  On the other hand, the nondisclosure of a material fact in the face of a

duty to disclose establishes the requisite reliance and causation for actual fraud.  <u>Apte</u>, 96 F.3d at

1323.  Reliance need not be reasonable, however.  <u>Eashai</u>, 87 F.3d at 1090.  "One who receives a

fraudulent representation of a fact 'is justified in relying upon its truth, although he might have

ascertained the falsity of the representation had he made an investigation.'"  <u>Eugene Parks Law</u>

<u>Corp. Defined Pension Benefit Plan v. Kirsh (In re Kirsh)</u>, 973 F.2d 1454, 1458 (9th Cir. 1992)

(citation omitted).

The Peglers argue that WCB's reliance could not have been justifiable because HFONC's

"loan was in default from May 23, 2010 to September 2010."[15]  The Peglers cite <u>Eashai</u> for the

proposition that "[i]f the creditor had warning that the debtor's account was in danger of default,

the creditor will not be able to establish justifiable reliance."  <u>Eashai</u>, 89 F.3d at 1091.  However,

<u>Eashai</u> can be distinguished from this case on its facts.  Eashai did not involve the renewal or

extension of an existing loan.  <u>Eashai</u> involved a credit card scheme in which the debtor used

cash advances on one credit card to make minimum payments on another credit card without the

intention to pay for the money, property or services received.  <u>Id</u>.  Furthermore, unlike in <u>Eashai</u>,

HFONC was not in default under the HFONC Loan when it requested the Second HFONC Loan

Extension.  Indeed, the Peglers admit that HFONC was current on the HFONC Loan through

---

[15] <u>Id.</u> at 16:5-6.

April 2010, and that "[i]t was only <u>after December 1, 2010</u> when HFONC, INC. did not pay the entire loan that payments other than the monthly interest [that] became due."[16]

Michael Pegler, as President/Secretary of HFONC, made false representations to WCB and concealed material information from WCB to secure from WCB a second extension of the HFONC Loan. Buckles relied on Michael Pegler's false representations in preparing and presenting a Credit Approval Memorandum to WCB's loan committee recommending approval of the Second HFONC Loan Extension.[17] Buckles testified that "[I]n concluding my Memorandum, I noted that the number one strength in support of extending the credit was the recent opening of HFONC's second store in Oxnard and recommended that '[B]ased on performance of the newly opened location in Oxnard, this day extension is recommended as presented.'"[18] In the Credit Approval Memorandum, Buckles placed great weight on the opening of the Oxnard Store as a second HFONC location in reliance on statements made by Michael Pegler. Had he known at the time that Michael Pegler never intended that HFONC own and operate the new consignment store at 921 E. Ventura Blvd., Oxnard, CA, Buckles would not have recommended to WCB that HFONC's request for a Second HFONC Loan Extension be approved.[19] Buckles also stated in the Credit Approval Memorandum that HFONC was not delinquent in rent in reliance on Michael Pegler's representation that there was no past rent due.[20] Had he known at the time that HFONC owed VCP over $66,000 in accumulated rent and CAM charges under the VCP Lease, Buckles would not have recommended to WCB that HFONC's request for a Second HFONC Loan Extension be approved.[21]

---

[16] <u>Id.</u> 15:3-7 (emphasis added).

[17] Buckles Decl. 10:22-27; 12:21-25.

[18] <u>Id.</u> at 10:4-7.

[19] <u>Id.</u> at 11:15-23.

[20] <u>Id.</u> at 12:16-25.

[21] <u>Id.</u> at 12:26 – 13:1.

The banking relationship between WCB, HFONC and the Peglers dated back to at least May 23, 2008.  The financial information requested by WCB from HFONC and Michael Pegler's responses thereto as President/Secretary of HFONC formed an integral part of WCB's decision whether to approve or deny the Second HFONC Loan Extension.  There were no facts evident from HFONC's original loan application or HFONC's First HFONC Loan Extension that might have placed WCB on notice that any of the information provided by Michael Pegler, as President/Secretary of HFONC, in connection with the Second HFONC Loan Extension was false or that material information about HFONC's financial condition and business activities had been concealed by Michael Pegler, as President/Secretary of HFONC.  WCB's reliance was justifiable.

C.  Pacific Western's Second Claim for Relief – Nondischargeability of Debt Under 11 U.S.C. § 523(a)(2)(B).

1. Section 523(a)(2)(B) excepts from discharge a debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by – use of a statement in writing – (i) that is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and (iv) that the debtor caused to be made or published with intent to deceive."  11 U.S.C. § 523(a)(2)(B).

2. A creditor must prove by a preponderance of the evidence under § 523(a)(2)(B): (1) a representation of fact by the debtor; (2) that was material; (3) that the debtor knew at the time to be false; (4) that the debtor made with the intention of deceiving the creditor; (5) upon which the creditor relied; (6) that the creditor's reliance was reasonable; and (7) that damage proximately resulted from the representation.  See Candland v. Insurance Co. of North Am. (In re Candland), 90 F.3d 1466, 1470 (9th Cir. 1996).

1. <u>Michael Pegler Fraudulently Omitted From HFONC's Balance Sheet and Profit & Loss Statement HFONC's Liability for Past Due Rent and CAM Charges Under the VCP Lease</u>

At WCB's request, HFONC submitted the following financial information to WCB in connection with its Second HFONC Loan Extension request:  (a) HFONC's Balance Sheet, as of June 30, 2010; and (b) HFONC's Profit and Loss Statement for the period of July 2009 through June 2010.  Michael Pegler signed a Business Financial Certification as President/Secretary of HFONC certifying the truthfulness of the information contained in HFONC's balance sheet and profit and loss statement.  On June 30, 2010, HFONC owed VCP a total of $119,780.01 in unpaid rent and accrued CAM charges under the VCP Lease.  This material fact was not disclosed by Michael Pegler, as President/Secretary of HFONC, in either HFONC's Balance Sheet, as of June 30, 2010 or in HFONC's Profit and Loss Statement for the period of July 2009 through June 2010.

The Peglers argue that the Second HFONC Loan Extension was effective May 23, 2010, so any written representations made on or after May 31, 2010, are irrelevant because they occurred after the agreement was consummated.[22]  The court disagrees.  Michael Pegler, individually and as President/Secretary of HFONC, sought a Second HFONC Loan Extension from WCB in April 2010, and negotiations regarding the Second HFONC Loan Extension continued through the HFONC Loan's maturity date on May 23, 2010 until the Second HFONC Loan Extension was approved on September 3, 2010.  During that time, HFONC and the Peglers had an ongoing duty to provide truthful and accurate financial information to WCB in response to WCB's requests for financial information, to correct any errors in information submitted to WCB, and to supplement such information with any material facts omitted by them so that WCB could make an informed decision whether to grant or deny the requested Second HFONC Loan Extension.  That duty to disclose did not cease on May 23, 2010.

---

[22]  Peglers' Motion, 13:21 – 14:2.

Michael Pegler also claims that HFONC was current under the VCP Lease at the time WCB approved the Second HFONC Loan Extension, pointing to the letter agreement between HFONC and VCP dated August 20, 2010.  The Peglers argue that under the letter agreement "all prior delinquent rent issues were resolved, the lease was declared to be current, the monthly rent was lowered, and the past due rent amount was reduced by negotiation and stabilized in a long term repayment situation, all to the material favor of HFONC INC."[23]  However, there is no evidence that Michael Pegler, either individually or as President/Secretary of HFONC, ever disclosed material facts to WCB regarding the nature and extent of HFONC's ongoing default under the VCP Lease prior to approval of the Second HFONC Loan Extension, including the fact that:  (a) notwithstanding the disclosures contained in HFONC's financial statements submitted to WCB, HFONC owed VCP a total of $119,780.01 in unpaid rent and accrued CAM charges under the VCP Lease on June 30, 2010; and (b) in conjunction with the reduction in monthly rent for 2010 under the letter agreement dated August 20, 2010, HFONC confirmed its liability to VCP for delinquent rent, attorneys' fees, and other amounts attributable to the VCP Lease totaling in excess of $66,000 and agreed to pay such amount over time in accordance with the terms of the letter agreement.

HFONC owed VCP the sum of $119,780.01 in unpaid rent and accrued CAM charges under the VCP Lease on June 30, 2010.  Michael Pegler, as President/Secretary of HFONC, did not disclose this information in HFONC's Balance Sheet, as of June 30, 2010, HFONC's Profit and Loss Statement for the period of July 2009 through June 2010, or otherwise to WCB prior to approval of the Second HFONC Loan Extension.  In an email to Buckles on August 13, 2010, Michael Pegler advised Buckles that HFONC has negotiated a "rent reduction" with its landlord. However, Michael Pegler did not disclose that the so-called "rent reduction" included an extension of time to pay $49,271.29 in unpaid rent and CAM charges incurred prior to January 1, 2010, plus an agreement to pay $4,000 in attorneys' fees, for a total of $53,271.29. [24]  Nor is

---

[23]  Declaration of Michael Pegler in Support of Defendants' Motion for Summary Judgment ("Pegler Decl."), 5:11-15.

[24]  Pacific Western's Appendix, Exh. # 16, at 105 (emphasis added).

there any evidence that WCB was provided with a copy of the August 20 letter prior to Buckles'

preparation of the Credit Approval Memorandum dated September 1, 2010.  These were material

facts regarding HFONC's financial condition that HFONC had a duty to disclose to WCB so that

WCB could make an informed decision whether to approve or deny the requested Second

HFONC Loan Extension.  See Candland, 90 F.3d at 1470 ("Material misrepresentations for this

statutory section are substantial inaccuracies of the type which would generally affect a lender's

or guarantor's decision.").

    2.  The Peglers Fraudulently Omitted From Their Personal Financial Statement as of May
        31, 2010, Michael Pegler's Contingent Liability for Past Due Rent and CAM Charges
        Under the VCP Lease

At WCB's request, the Peglers submitted a Personal Financial Statement as of May 31,

2010, in connection with HFONC's request for a Second HFONC Loan Extension.  Michael

Pegler and Wendy Pegler signed a Personal Financial Certification certifying the truthfulness of

the information contained in their Personal Financial Statement as of May 31, 2010.  In their

Personal Financial Statement, the Peglers represented that they owned (a) personal assets and

home furnishings valued at $60,000; and (b) 100% of the stock in HFONC valued at $500,000.

The Peglers also represented in their Personal Financial Statement as of May 31, 2010 that they

did not have any contingent liabilities.  Based on the information contained in their Personal

Financial Statement, Buckles concluded in his Credit Approval Memorandum dated September

1, 2010, recommending approval of the Second HFONC Loan Extension that the Peglers had a

net worth of $64,647.

The Peglers argue that, because the Peglers' "guarantees arose in May 23, 2008 and

continued by their own terms until HFONC INC fully paid the loan[,] [n]o extension of the

guarantees was accomplished by the May 23, 2010 agreement."[25]  The court again disagrees.

The obligations of Michael Pegler and Wendy Pegler under their respective Commercial

Guaranty agreements to pay the HFONC Loan were scheduled to mature on May 23, 2010.

---

[25] Peglers' Motion, 3:6-10.

HFONC sought and obtained from WCB the Second HFONC Loan Extension which, in turn, extended the obligations of the Peglers under their respective Commercial Guaranty agreements. WCB sought the Peglers' Personal Financial Statement to verify that their net worth, and the corresponding value of their respective Continuing Guaranty agreements, remained sufficient to justify a Second HFONC Loan Extension.

WCB claims the Peglers intentionally and fraudulently overvalued the HFONC stock and personal property in their Personal Financial Statement for the purpose of obtaining the Second HFONC Loan Extension, noting that the Peglers' valuation of the HFONC stock and household furnishings in their bankruptcy schedules filed two years later was substantially lower. In response, Michael Pegler asserts that he "used retail current replacement cost valuation method when giving [his] opinion as to the value of [his] personal property for the May 31, 2010 Personal Financial statement, and [he] used the bankruptcy liquidation valuation method for the personal property in [his] bankruptcy schedules."[26] The Peglers claim that their valuation of the HFONC stock  was "based on a written valuation purchased by [the Peglers] from Keystone Business Brokers Inc. dated March 13, 2008 [which] stated an asset range value of $500,000 to $550,000.00"[27]

There is no evidence in the record of the valuation by Keystone Business Brokers, Inc. However, there is also no evidence in the record to support a finding that the valuations contained in the Personal Financial Statement were not substantially accurate when made. The fact that value of the assets contained in the Peglers' Personal Financial Statement differs from the value placed on the assets two years later in their bankruptcy schedules does not, of and by itself, establish that the Peglers' intentionally overvalued such assets in the financial statement for the purpose of deceiving WCB. The difference in the HFONC's stock valuation might be attributable to the simple fact that HFONC was an ongoing business on May 31, 2010, and had ceased doing business prior to the Peglers' first bankruptcy case on April 17, 2012. Therefore, a

---

[26] Pegler Decl., 5:16-21.

[27] Peglers' Motion, 11:12-15.

genuine issue of material fact exists as to (a) whether the value of the HFONC stock and the Peglers' personal assets and home furnishings, as stated in the Personal Financial Statement as of May 31, 2010, is false; and (b) whether the Peglers knew at the time that the valuations were false.

The Peglers failed to disclose in their Personal Financial Statement as of May 31, 2010, Michael Pegler's contingent liability attributable to his personal guaranty of HFONC's VCP Lease.  HFONC owed VCP accumulated rent under the VCP Lease of $49,271.29 through December 31, 2009, plus an additional $27,648.94 for the months of January and February 2010, for a total of $76,920.23 in unpaid rent and accrued CAM charges as of April 5, 2010.  This amount was not disclosed by the Peglers as a contingent liability of Michael Pegler in their Personal Financial Statement as of May 31, 2010.  By June 30, 2010, the amount had increased to $119,780.01.  Even after execution of the letter agreement dated August 20, 2010, Michael Pegler remained a guarantor of the VCP Lease and liable for payment of not less than $66,000 in past due rent and accrued CAM charges due by HFONC under the VCP Lease.

At all times during the negotiations between HFONC and WCB regarding the Second HFONC Loan Extension, Michael Pegler possessed a contingent liability of not less than $66,000 as a guarantor of the VCP Lease.  The Peglers did not disclose this fact in their Personal Financial Statement as of May 31, 2010, nor did they take steps to correct their nondisclosure of this material fact prior to WCB's approval of the Second HFONC Loan Extension on September 3, 2010.  These were material facts regarding the Peglers' financial condition that the Peglers had a duty to disclose to WCB so that WCB could properly determine their net worth, and the corresponding value of their respective Continuing Guaranty agreements, and make an informed decision whether to approve or deny the requested Second HFONC Loan Extension.

3.  Reasonable Reliance

Courts must look to the "prudent person test" to determine whether the creditor reasonably relied on a debtor's misrepresentations.  In re Machuca, 483 B.R. 726, 736 (9th Cir. BAP 2012).  The prudent person test is an objective assessment "whether the creditor exercised the same degree of care expected from a reasonably prudent person entering into the same type

of business transaction under similar circumstances." Id.  "[W]hen there is evidence of materially fraudulent statements, little investigation is required for a creditor to have reasonably relied on the representations." Gertsch, 237 B.R. at 170.  "[A]bsent other factors, a creditor demonstrates reasonable reliance by showing that it followed its normal business practices."  Id.

WCB reasonably relied on the representations made by HFONC and the Peglers regarding their financial condition in connection with the Second HFONC Loan Extension. WCB followed its normal business practice in processing and evaluating HFONC's request for the Second HFONC Loan Extension.  As previously stated, the banking relationship between WCB, HFONC and the Peglers dated back to at least May 23, 2008.  The financial information requested by WCB from HFONC and Michael Pegler's responses thereto as President/Secretary of HFONC formed an integral part of WCB's decision whether to approve or deny the Second HFONC Loan Extension.  There were no facts evident from HFONC's original loan application or HFONC's First HFONC Loan Extension that might have placed WCB on notice that any of the information provided by Michael Pegler, as President/Secretary of HFONC, or by the Peglers, individually in connection with their ongoing guaranty of the HFONC Loan, was false or that material information about HFONC's financial condition and business activities had been concealed by them.  Michael Pegler admits that he knew WCB would rely on representations in the Personal Financial Statement to determine creditworthiness in connection with the Second HFONC Loan Extension.[28]  Buckles stated in the Credit Approval Memorandum that HFONC was not delinquent in rent in reliance on Michael Pegler's representation that there was no past rent due.[29]  Had he known at the time that Michael Pegler had a contingent liability in excess of $66,000 attributable to HFONC's past due rent and CAM charges under the VCP Lease, Buckles

---

[28]  Joint Pretrial Stipulation and Order, 13:26-14:1.

[29]  Buckles Decl., 12:16-25.

would not have recommended to WCB that HFONC's request for a Second HFONC Loan

Extension be approved.[30]  WCB's reliance was reasonable.

4.  <u>Intent to Deceive</u>

There is a genuine issue of material fact as to whether the Peglers' representations as to

value contained in their Personal Financial Statement as of May 31, 2010, were made with an

intent to deceive WCB.  However, there is no triable issue with respect to the Peglers' failure to

disclose Michael Pegler's contingent liability in excess of $66,000 for past due rent and accrued

CAM charges due by HFONC under the VCP Lease.  The Peglers did not disclose this fact in

their Personal Financial Statement as of May 31, 2010, nor did they take steps to correct their

nondisclosure of this material fact prior to WCB's approval of the Second HFONC Loan

Extension on September 3, 2010.  The only reasonable inference that can be drawn is that

Michael Pegler, as President/Secretary of HFONC, and the Peglers, individually in connection

with their ongoing guaranty agreements, concealed this material information from WCB with the

intention and purpose of deceiving WCB into approving the Second HFONC Loan Extension.

The Peglers have not articulated any factual basis or produced significantly probative evidence

on this issue to support an inference to the contrary.

D. <u>Pacific Western Failed to Produce Evidence Establishing a Genuine Issue of Material Fact for
Trial Regarding the Damages Proximately Caused by the Fraudulent Representations or
Omissions</u>.

Having sought summary judgment, Pacific Western had the burden to produce evidence

establishing that there is no triable issue of material fact with respect to each element of its

respective claims under § 523(a)(2), including the damages proximately caused by the false

representations or fraudulent omissions described in the complaint.  <u>Celotex</u>, 477 U.S. at 323.

To survive the Peglers' motion for summary judgment, it was incumbent upon Pacific Western

to produce significantly probative evidence showing that a genuine issue of material fact existed

for trial with respect to each element of its respective claims, including the issue of damages

---

[30] <u>Id.</u> at 15:10-18.

proximately caused by such fraudulent representations or omissions. Id. at 325. Pacific Western failed on both counts.

To establish damages proximately caused by false representations or fraudulent omissions made in connection with the renewal or extension of an existing loan, "a creditor seeking nondischargeability under section 523(a)(2)(B) must show that it had valuable collection remedies at the time it agreed to renew its commitment to the debtor, and that those remedies later became worthless." Siriani, 967 F.2d at 305. The same standard has been applied to similar claims brought under § 523(a)(2)(A). See Kim, 163 B.R. at 161 ("Specifically, if the creditor demonstrates that it had valuable collection remedies at the time of the extension or renewal, that it did not exercise in reliance on the debtor's misrepresentation and that those remedies lost value during the renewal or extension period, the creditor has shown proximate damage to the extent that those remedies lost value."). "There is no new money requirement for bringing an action pursuant to § 523(a)(2)." Id. But "a creditor is not required to show that, had it not renewed its commitment in reliance on the debtor's fraudulent statements, it would have exercised its collection remedies in a sufficiently timely fashion to collect the debt." Siriani, 967 F.2d at 305.

Pacific Western claims that "WCB had valuable collection remedies against HFONC and [the Peglers] at the time HFONC's loan was extended which lost value during the extension period." In support of its contention, Pacific Western asserts that (a) "HFONC made expenditures for the benefit of TWC-Oxnard, Inc.;" (b) "paid for the salaries of a number of individuals that were employed by and/or performed services for the TCW-Oxnard Inc. store, both before and after its formal opening on August 1, 2010;" (c) "paid entirely for the advertising that referenced both HFONC's business and TCW-Oxnard, Inc.'s business for two or three months after TCW-Oxnard, Inc.'s opening in 2010;" (d) "transferred some of its consignment inventory to TCW-Oxnard, Inc. for its opening;" and (e) "paid the lease deposit on the Oxnard

location."[31]   However, there is no evidence regarding (a) the value of Pacific Western's collection remedies on the effective date of the Second Extension on May 23, 2010; (b) the value of Pacific Western's collection remedies on the date of maturity on December 1, 2010; or (3) that there was a diminution in the value of Pacific Western's collection remedies at any time between May 23 and December 1, 2010.  See Kim, 163 B.R. at 161 ("[P]roximate damages [are] calculated by comparing what would have been the value of the creditor's collection remedies on the date of the extension to the value of such remedies at the end of the extension or renewal period.").  According to the evidence, all accrued interest due under the HFONC Loan was current at the time of the Second Extension.  Pacific Western also received certain benefits as a direct result of the Second Extension, including:  (1) a $5,000 payment from the Peglers reducing the principal amount of the loan from $150,000 to $145,000; (2) an increase in the interest rate from 6% to 7%; and (3) the removal of the line of credit feature from the loan.  There is no evidence to show that, had Pacific Western exercised its collection remedies, its eventual loss on the loan would have been reduced.

Notwithstanding the foregoing, Pacific Western claims that it is entitled to damages proximately caused by the Peglers' false representations or fraudulent omissions in an amount equal to "the amounts due and unpaid on the loan."[32]  Pacific Western seeks a judgment declaring nondischargeable under § 523(a)(2) damages "in the amount of $176,673.43, plus interest thereon from April 18, 2012 at the rate of 10% per annum ($48.40 per day)," plus attorneys' fees and costs of court.[33]  Pacific Western does not point to any statutory authority or case law to support its contention other than the following statement drawn from the legislative history of § 523 recorded in the Congressional record:

---

[31]  Plaintiff's, Pacific Western Bank's, Memorandum of Points and Authorities in Support of Motion for Summary Judgment or in the Alternative for Summary Adjudication of Claims, 17:18 – 18:11.

[32]  See Joint Pretrial Stipulation and Order, 19:18.

[33]  See Id. at 19:28 – 20:1.

[I]f an existing loan is in default or the creditor otherwise reasonably relies to his detriment on a false financial statement with regard to an existing loan, the entire debt is nondischargeable." 124 Cong. Rec. 32399 (1978) (statement of Rep. Edwards), 124 Cong. Rec. 25, 33998 (1978) (statement from Sen DeConcini).[34]

The Bankruptcy Appellate Panel in Kim referred to these comments on the floor of Congress to demonstrate that there is no "new money" requirement under § 523(a)(2). See Kim, 163 B.R. at 160. This legislative history does not, however, trump the standard set by the Ninth Circuit in Siriani as later applied in Kim, for establishing damages proximately caused by false representations or fraudulent omissions made in connection with the renewal or extension of an existing loan.

Kim required Pacific Western to establish a diminution in the value of its collection remedies between the effective date of the Second HFONC Loan Extension and the maturity date of the loan, as extended under the Second HFONC Loan Extension. Pacific Western has not shown that it suffered any actual damage attributable to the false representations and/or fraudulent omissions made the basis of the complaint nor has it submitted significantly probative evidence of such alleged damages to create a genuine issue of fact for trial.

## CONCLUSION

For the reasons stated, the court will enter (a) an order denying Pacific Western Bank's Motion for Summary Judgment or in the Alternative for Summary Adjudication of Claims; and (b) an order granting the Peglers' motion.

### ###

Date: September 24, 2014

Peter H. Carroll
United States Bankruptcy Judge

---

[34] Plaintiff's Reply to Defendants' Response to Plaintiff's Motion for Summary Judgment/Summary Adjudication of Claims, 4:16-19.